We're going to move now to Appeal 22-1805, Ying Ye v. GlobalTranz Enterprises, and we're going to begin with oral argument from Ms. Rosenberg. Take a minute if you want to get some water, that's fine. Ms. Rosenberg. Thank you. May it please the Court, Adina Rosenberg on behalf of Appellant Ying Ye. This case presents the question whether negligent hiring claims sounding in personal injury against freight brokers based on their negligent hiring of an unsafe motor carrier to provide transportation by motor vehicle are preempted by the Federal Aviation Administration Authorization Act, often called the F-Quad-A. The F-Quad-A preempts certain state laws related to the price route or service of a motor carrier or broker, but also contains an exception known as the safety exception for the safety regulatory authority of a state with respect to motor vehicles. Personal injury claims against freight brokers based on the negligent hiring of an unsafe motor carrier are not preempted by the F-Quad-A, both because they fall within the safety exception and then also because they do not fall within the scope of the F-Quad-A's preemption provision in the first place. I'd like to start with the safety exception, which provides that the preemption provision does not restrict the safety regulatory authority of a state with respect to motor vehicles. Global Trans does not argue that a personal injury claim based on negligent hiring is not part of the state's safety regulatory authority. So the only question is whether such a claim invokes that authority with respect to motor vehicles. As the only court of appeals to have considered the issue as held, as well as most district courts to have considered the issue, such a claim does invoke the state's safety regulatory authority with respect to motor vehicles and therefore falls within the safety exception. A state law concerns motor vehicles, or is with respect to motor vehicles, if it concerns motor vehicles. And the state law duty underlying the claim at issue here concerns motor vehicles and the dangers that they pose. Ms. Rosenbaum, just in the interest of time, you've done a very good brief, as has your adversary. I totally get your position. Can I ask you a question about your argument on the safety exception? What makes the case so difficult is whether to interpret that broadly or narrowly. That's what it all hinges upon. What seems to make your side of this challenging, and your adversary has some challenges too, is that motor vehicles is a very specific statutory term, as is motor carriers. And they're referenced in the express preemption provision that is right next door to the safety exception. And when I look at Title 49 broadly, not focused on these words in particular, it sure looks to me like Congress has regulated and empowered the Secretary of Transportation to regulate motor vehicles and motor carriers in pretty expansive ways. And so what's the question that arises out of that? Given that, doesn't that suggest that we should read the word motor vehicles in 2A in the safety exception to mean just that, motor vehicles? In other words, not to pick up brokers. And I'm asking it from a conclusion that can be divined or that seems to be there from the very broad statutory structure and the substance of that structure in Title 49. Well, Title 49 does contain safety regulations of motor carriers and brokers, both of them. And motor vehicles. And motor vehicles. So those are all regulated by Title 49. But that does not – those federal regulations just are what federal law requires for motor carriers or brokers or motor vehicles to be on the road. They do not keep the states from being able to impose other safety regulations, as the safety exception demonstrates. Okay, but you've got to now get – okay, that's your conclusion, right? That's the conclusion you want us to accept. But you've got to then get there. Well, that's also due to the federal motor carrier safety regulations themselves say that those regulations are not intended to preclude states or subdivisions thereof from establishing or enforcing state or local laws relating to safety, the compliance with which would not prevent full compliance with these regulations by the person subject thereto. So there's a recognition that states can impose safety regulations that are greater than the federal safety regulations. In terms of the actual language in the safety exception with respect to motor vehicles, the way the safety exception is written is different than the preemption provision itself. So the preemption provision is focused on the entities. It talks about brokers, motor carriers, freight forwarders. But the safety exception is not based on the nature or identity of the regulated entity. Instead, it's based on the nature of the safety regulatory authority at issue. So that safety regulatory authority has to be with respect to motor vehicles. And the Supreme Court has interpreted the word with respect to to mean concerns. So that safety regulatory authority has to concern motor vehicles. And a state law can concern motor vehicles and the dangers that they pose. A state law like that can regulate motor carriers or it can regulate brokers like the state law at issue here does. And a broker's hiring of a motor carrier to provide motor vehicle transportation is directly related to the safety of motor vehicles. As the United States explained in its brief recommending that the Supreme Court deny certiorari in C.H. Robinson versus Miller, the selection of a safe motor carrier is logically a meaningful component of commercial motor vehicle safety. Brokers hire motor carriers in order to provide transportation by motor vehicle. And which motor carrier the broker hires has a direct effect on motor vehicle safety. Ms. Rosenbaum, if we find that the preemption provision in one applies and we turn to the safety regulatory exception, but we find that language ambiguous, and I think the fact that you have district courts on both sides lends to that to some extent, what's your best argument that what we should look to to support your argument? So you've spent a lot of time in your brief arguing plain language of the text. And under the plain language, because it is respect to motor vehicles and the accident here was a motor vehicle accident, that's it. Assume we think that's one plausible reading, but we think that the defense has a plausible reading as well. Then what? You know, I do think it's the best reading of the text. Yeah, but let's assume that we think you both have solid readings. Where should we go then to support your position, or where would you suggest we go to support your position? I think that the purpose of the safety exception also supports our position, that the Supreme Court stated that the clear purpose of the safety exception was to make sure that the economic, the preemption of the economic regulation of motor carriers or brokers in this case doesn't keep states from being able, from their historic and traditional police power of regulating safety. You have ours garage in mind? Ours garage, yes, which was also interpreting the safety exception. And I think the breadth of the term with respect to motor vehicles does indicate that. You're back to the plain language. I am back to the plain language there. I think that the purpose would be in addition to the plain language. What do we make of, and I'm going to pick up a little bit on what Judge Scudder was asking you about Title 49 and the structure of the statute. What are we, how is your argument consistent with the fact that Congress really put the heavy insurance requirements, mandatory insurance requirements on motor carriers for these type of accidents and really didn't put any insurance requirements on brokers other than for economic reasons, which seems inconsistent with your position? I don't think that that speaks to preemption. What the insurance requirements are. I'm talking not about preemption. I'm talking about the safety exception only. I think it doesn't speak to the safety preemption. What the insurance requirements on motor carriers demonstrates is that Congress was particularly concerned about whether motor carriers would be able to pay claims against them. But that Congress did not have that same concern about brokers doesn't show that it intended to immunize brokers from being held liable and keep states from being able to deprive states of the authority to regulate in the name of safety when it came to brokers and brokers acting negligently in hiring unsafe motor carriers. Back to a discussion about the statute. Should we interpret the phrase with respect to the safety exception the same way we interpret the phrase relating to the preemption presumption? I think those are both very broad phrases and they both encompass direct and indirect regulation. This court in interpreting the related to language has looked at whether it has a significant economic effect. And I don't know that that economic aspect would necessarily come into the test with a safety exception. I think instead it's, you know, the Supreme Court has explained that the safety part of the safety exception requires the law to be genuinely concerned with safety. So I think it would be a question of whether the law is genuinely concerned with safety concerning motor vehicles. So genuinely concerned with the dangers posed by motor vehicles. So we should look elsewhere for words that do work in those phrases other than with respect to or relating to? Well, the Supreme Court has equated with respect to with concern. So I think the question is just whether the state law safety authority concerns motor vehicles. And here it does. The common law duty regulates the hiring of motor carriers to operate motor vehicles in order to reduce injuries and fatalities caused by motor vehicles. It's concerned with the dangers posed by motor vehicles on the road and gets at that safety by trying to ensure that motor carriers, that unsafe motor carriers are not placed on the road with other drivers and passengers. And brokers hire motor carriers to provide transportation by motor vehicles. That's part of the definition of a motor carrier. And which motor carrier a broker hires has a direct effect on motor vehicle safety. Do you want to reserve the rest of your time? Yes, I would like to reserve the rest of my time. Thank you, Ms. Rosenbaum. Thank you. Mr. Cook, we'll move to you. Good morning, Your Honor. May it please the court. I think the court, based on the questions you're asking, plaintiff's counsel wants to focus on the safety exceptions, so I'm going to start there. Section 14501C2A saves from preemption the safety regulatory authority of the state with respect to motor vehicles. This is what plaintiffs refer to as the safety exception. The safety exception does not end with the first clause in the statutory provision, but goes on, also saving from preemption the authority of the state to impose highway route controls or limitations based on the size and weight of motor vehicles, or the authority of the state to regulate motor carriers with regard to minimum amounts of financial security or insurance. The plain language of the safety exception applies only to motor carriers and motor vehicles on a limited basis. While the term brokers is expressly included in the general preemption provision in the F4A, the term is conspicuously absent in the safety exception. So when you acknowledge that it covers, even though it says motor vehicles, you say, well, you just said it should, I think it covers motor carriers as well. Well, motor carriers are the entities regulated by the federal government to operate motor vehicles. So if tomorrow a state passed a law that said a motor carrier cannot operate unless it's approved by FMCSA, quote, unquote, is that state law preempted or not preempted? Well, I think it would certainly relate to the rate, route, and service of a motor carrier, but it would fall within because it relates to a motor carrier would be saved from preemption under the exception. It would also be consistent with what federal law requires. It would? Okay. So you'd say that? To the extent it relates to the motor carrier, imposing an obligation on the motor carrier. It seems like it's safety related, or it seems enough like it's safety related, and therefore it's saved from preemption? To the extent that it relates to a regulation or law imposing an obligation on a motor carrier, yes. If Congress intended to preserve certain regulatory powers of the state over brokers, it could have done so in the safety exception in Section 14501C, but the plain language of the statute demonstrates that it did not. And you were asking questions of the Plaintiff's Counsel of where else would we look to find some answers about what the language in 14501C2A means, and I think we find that by looking at the other provisions of F4A. There are four sections of the F4A. It's 14501 sections A through D, and to accept Plaintiff's argument that the safety exception in 14501C2A applies to save negligent hiring claims against brokers for preemption, one also has to accept that Congress intended to allow for greater state regulation of brokers involved in interstate transportation than it did for brokers involved in interstate transportation. Each section in F4A contains an express preemption provision, but a safety exception only appears in subsections A and C, which are both titled to relate to motor carriers. But Section 14501B relates only to freight forwarders and brokers and provides for preemption of state laws relating to interstate routes, rates, and services of any forwarder or broker. There is no safety exception with respect to the safety regulatory of the state with respect to motor vehicles in subsection B. Thus, where Congress addressed freight forwarders and brokers only in Section 4501B, it chose not to include a safety exception. I think this is clear textual evidence that Congress intended the safety exception in Section 14501C to apply only to motor carriers and the motor vehicles they operate and not to the freight forwarders and brokers, which neither own nor operate motor vehicles. To conclude otherwise would assign a particular intent to Congress to preempt interstate regulation of freight forwarders and brokers to a greater degree than interstate regulation of these groups, and this is simply not logical. Moreover, in addition, the safety exception further specifies and saves from F4 preemption the state's regulatory authority over minimum amounts of insurance that motor carriers are required to maintain. No subsection from preemption relates to the state's regulatory authority to require brokers to maintain minimum amounts of liability insurance. This underscores Congress's understanding that state tort liability for motor vehicle accident falls on the motor carrier and not the brokers and further demonstrates Congress's intent with respect to the applicability of the safety exception as to not include brokers. Congress itself imposes a federal requirement on motor carriers to maintain liability insurance sufficient to pay judgments for wrongful death and personal injury resulting from the negligent operation, maintenance, or use of motor vehicles and conditions the issuance of motor carrier registration and authority from the FMCSA on the maintenance of such insurance. No such insurance is required by brokers who only need to maintain a bond sufficient to pay their motor carrier's invoices with whom they arrange transportation. What do you ask the court to do with the Ninth Circuit's decision in Miller? Well, I think the Ninth Circuit's decision in Miller was problematic for a number of reasons. Number one, they referred to a presumption against preemption that the court, the later Ninth Circuit court, said it was problematic that we need to look at the plain text of the statute which provides the best evidence of Congress's intent at the time to pass a statute without a presumptive thumb on the scale, so to speak. And that was in Puerto Rico v. Franklin, from the Puerto Rico v. Franklin Cal Tech's case, the Supreme Court's, where they're saying, hey, no presumptive thumb on the scale, let's just look at the plain language of the statute. I think the other problem with Miller is just basically they relied on the Cal Tow Truck case versus the city of San Francisco, which basically to support their decision, in that case, the language was, well, a regulation doesn't have to relate solely to the safe operation of a motor vehicle for it to concern motor vehicles, but in that case, the regulated entities were still tow truck operators and their drivers. There was a requirement that they obtain a permit and disclose their criminal history. But again, those are tow truck operators, so they're the motor carriers, and they're the drivers that operate the motor vehicles. So while there may be a connection to motor vehicles, the safety exception of motor vehicles, I think that's a stretch too far to extend it to brokers, and that's exactly the point that Assent made, that the case law that the Ninth Circuit was relying on to extend the safety exception to include brokers was really just not warranted on the facts. And at some point, you have to draw a line, and it just was too attenuated that the regulation, the negligent hiring claims are too attenuated to motor vehicle safety. I think the decision of the opinion of the deceptive judge is directly on point there. Mr. Cook, let me ask you this. Suppose hypothetically that your client hired a motor carrier to transport a load, and that motor carrier was not authorized under the FMCSA listing. The motor carrier then gets in an accident and hurts or kills somebody in the transport. In that circumstance, as I understand the regulatory regime, FMCSA can impose a fine on your client for failure to comply with the regulations regarding the listings of those authorized to be motor carriers. Do you agree with that? Yes. I think it's take regulatory action, including the business of fines. That would be the FMCSA, and it would do so based on federal law. Right. Okay. And then what you have as well is you have in Title 49, in 31136A, you have a provision where Congress is expressly stating that federal regulations promulgated by FMCSA will provide, quote, only minimum safety standards. Minimum. So doesn't that suggest that a state could come in and regulate above the minimum federal floor? Well, I think they could. And do that through the imposition of common law liability? Well, I think they could, and I think courts have long recognized that. And when Congress passed the F4A, they envisioned that, yes, that states could do that with respect to motor carriers who operate motor vehicles. But that same understanding did not exist with respect to brokers, or otherwise they would have put them in the safety exception. I think you're correct that I think you mentioned the federal regulations extensively regulate, FMCSA extensively regulates motor carriers and the motor vehicles they operate, and the drivers that drive those motor vehicles. Your point is your client's not situated that way. No, they're a broker who does not own or operate motor vehicles. They merely arrange transportation with motor carriers. The negligent hiring claims seek to shape the duty that brokers provide in selecting a motor carrier. They don't seek to regulate motor vehicles. The claims are focused on what a broker does prior to when transportation even begins.  Why do you see the effort to use common law in the way you just described as inconsistent with the broader statutory scheme as it relates to brokers? So step outside of the exact wording. Well, it's inconsistent with the statutory scheme because you have to also include what does F4A do. It precludes state laws from coming in and shaping the services that brokers, with respect to brokers, that they're going to provide. So if we look at the statutory scheme as it relates. How would it shape the services, though, in any way that's inconsistent with the regulatory scheme, as opposed to just being additive? Well, it's inconsistent with the regulatory. In Roe, the question is are the state regulations requiring, in that case, a motor carrier, and in this case a broker, to provide a service that the market doesn't currently provide and that carriers or brokers would prefer not to offer. And even if that isn't the case, that they might want to discontinue in the future. So if a state law requires brokers to provide a service they currently don't have to provide, it would be inconsistent with the statutory scheme in general. Because if you look at what the federal regulations require of brokers, it is only to arrange transportation with an authorized motor carrier. If you look at what the state law claims, including plaintiffs, are trying to impose, it is a duty based solely on state common law to investigate and make safety determinations about the motor carriers it's going to hire. It has to do this and evaluate and make determinations as to whether any prior issues or violations would be permissible under the common law of one or more states through which a shipment of cargo would be passing through. And, again, in plaintiff's complaint and in all these negligent hiring claims, they go and they point to the FMCSA's own website, the website listing safety data. They rely on those claims. However, in 2015, in response to questions about the reliability of that data on that information, the FMCSA's website comes with the following warning. Readers should not draw any conclusions about the carrier's overall safety conditions simply based on the data displayed in the system. Unless a motor carrier has received an unsatisfactory rating or has otherwise been ordered to discontinue operations by the Federal Motor Carrier Safety Administration, it is authorized to operate on the nation's highways. So the plaintiffs are seeking to impose a duty on brokers, which federal regulations do not require, to make safety determinations based on data that's not reliable, the FMCSA's data that's not reliable, and upon which the FMCSA has taken no action on its own. This is an impossible duty to meet, especially if the broker is all supposed to make some determination as to, you know, there's multiple states this cargo is moving through. What state law is going to apply and what juries in that state are going to say what was good enough? When was a carrier safe enough to select transportation for? And federal regulations don't require. If you think the safety regulation is ambiguous, what do you think your strongest argument is in support of your position? I think the entire statutory context, when you look at F4A and Hull, you've got to look at when Congress addressed only freight forwarders and brokers in a provision, it did not include a safety exception. So why, you know, I think the inclusion of brokers in 14501C2 maybe creates some of the uncertainty that you're referring to, but that's clarified if we looked at when they addressed them in isolation, and based on the language of the safety exception itself, which just does not include brokers. Thank you, Mr. Cutler. Thank you. Thank you. We'll now move back to Ms. Rosenbaum for rebuttal. Thank you. So starting just with the scheme overall, the scheme does show an intent to preserve states' historical and traditional police power over safety, which negligent hiring claims like these are part of. And the Supreme Court specifically said with regard to the safety exception in Auer's garage that the deregulatory purpose of the F quad A, in general, the preemption provision, is not a reason to read the safety exception with a deregulatory purpose in mind and not a reason to adopt the narrowest construction of the safety exception. In terms of the structure of the overall of the preemption provisions in 14501, Global Trans refers to there not being a safety exception in 14501B, which is about intrastate prices, routes, and services. But Congress did not include interstate prices, routes, and services in 14501B. It separated out interstate prices, routes, and services from intrastate prices, routes, and services and addressed interstate prices, routes, and services in 14501C rather than in 14501B. So it could have addressed them in B, which does not include a safety exception, but instead addressed them in C, which does, which, if anything, indicates that it wanted laws related to interstate prices, routes, and services to be subject to the safety exception. In terms of the fact that the safety exception does not specifically reference brokers, it also doesn't specifically reference motor carriers or freight brokers. The safety exception does not depend on the nature of the regulated entity. Yeah, but the whole subtitle of C, C is worded motor carriers, so it would be very odd to read C2 to somehow not cover motor carriers. I mean, the umbrella of C is motor carriers. Yes, but then brokers are included within C also. C1. It's not in the title, but the preemption provision includes brokers, and then the safety exception says the preemption provision does not, in C1, does not restrict the safety regulatory authority of a state. So it's referring back to what's included in C1. And then it's based on the nature of the safety regulatory authority at issue rather than the nature of the regulated entity. And Global Trans focuses on the fact that brokers do not themselves own or operate motor vehicles, but a law can concern motor vehicles and the dangers that they pose without the regulated entity itself owning or operating motor vehicles. The words own or operate are not in the text of the exemption. All that the text of the exemption requires is that the safety regulatory authority at issue concern motor vehicles, which the state law duty here does. Have your clients, and I know this is relevant to statutory interpretation, but have your clients been able to recover any of the judgment against them, either from the driver or from the motor carrier? No, not to my knowledge. The motor carrier's insurance went into receivership and stopped defending the motor carrier, and I don't believe there has been. And what about the driver's insurance? I do not know about the driver. Thank you, Ms. Rosenbaum. Thank you, Mr. Cook. The case will be taken under advisement.